**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 46443**

| | |
|---|---|
| JENNIFER PORCELLO, ) | |
| ) | |
|    Plaintiff-Counterdefendant- ) | |
|      Respondent, ) | |
| ) | |
| v. ) | |
| ) | |
| The Estate of ANTHONY J. PORCELLO, the ) | |
| Estate of ANNIE C. PORCELLO, and ) | |
| KALYN M. PORCELLO, as Personal ) | |
| Representative, ) | |
| ) | |
|    Defendants-Counterclaimants- ) | Boise, June 2020 Term |
|    Appellants. ) | |
| _____ ) | Opinion Filed: August 3, 2020 |
| The Estate of ANTHONY J. PORCELLO, the ) | |
| Estate of ANNIE C. PORCELLO, and ) | Melanie Gagnepain, Clerk |
| KALYN M. PORCELLO, as Personal ) | |
| Representative, ) | |
| ) | |
|    Third Party Plaintiffs-Appellants, ) | |
| ) | |
| v. ) | |
| ) | |
| MARK PORCELLO, ) | |
| ) | |
|    Third Party Defendant-Respondent. ) | |
| ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Cynthia K.C. Meyer, District Judge.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded for further proceedings</u>.

Stoel Rives LLP, Boise, for appellants Estates of Anthony J. Porcello and Annie & Kalyn Porcello, as personal representative. W. Christopher Pooser argued.

Ramsden Marfice Ealy & DeSmet, Coeur d'Alene, for respondent Jennifer Porcello. Michael Ramsden argued.

1

Smith + Malek, PLLC, Coeur d'Alene, for respondent Mark Porcello. Peter J. Smith IV argued.

_____

STEGNER, Justice.

This case involves interpretation of a promissory note and a deed of trust involving a home and real property located in Hayden Lake, Idaho. In the summer of 2014, Mark and Jennifer Porcello, who were married at the time, sought to purchase this property. After making various pre-payments, the amount the couple needed to purchase the property was roughly $312,000. While Mark and Jennifer could not qualify for a conventional loan themselves, they hoped that another property in Woodinville, Washington, which was owned by Mark's parents, and in which Mark and Jennifer claimed an interest, could be sold to assist in the purchase of the Hayden Lake property. In an effort to help Mark and Jennifer purchase the property, Mark's parents, Annie and Tony Porcello, obtained financing through a non-conventional lender. In the end, the transaction became quite complicated. Annie and Tony ultimately took out a short-term, "hard money" loan[1] from Legacy Group Capital (LGC), with two properties (including the Woodinville property) serving as collateral. Due to the lender's requirements, and the ownership of other property by Mark and his parents, the amount borrowed by Annie and Tony ballooned to $648,500 and greatly exceeded the amount needed by Mark and Jennifer to close on the Hayden Lake property. Nevertheless, Annie and Tony's lawyer drafted a promissory note for Mark and Jennifer to sign which equaled the amount borrowed by Annie and Tony. In turn, Mark signed a promissory note and deed of trust for the Hayden Lake house, in the same amount and with the same repayment terms as the loan undertaken by his parents. Jennifer initially resisted signing the Note and Deed of Trust, but ultimately, after speaking to the lawyer who drafted the documents, signed them. With the funding provided, Mark and Jennifer purchased the Hayden Lake property.

In mid-2016, Annie and Tony sought non-judicial foreclosure on the Hayden Lake property, claiming that the entire balance of the note was due and owing. By this time Mark and

_____

[1] "Hard money" loans are a form of short-term financing, usually with higher interest rates than those of the traditional alternatives. "Hard money lenders tend to focus on the value of the collateral relative to the loan amount. These lenders are able to move quickly and require less in the way of due diligence and underwriting than traditional lenders." Erik North, *The Language of Loans*, 41 L.A. LAW 32, 34 (Jan. 2019).

Jennifer had divorced, although Jennifer still occupied the Hayden Lake home. In response to the foreclosure proceeding, Jennifer filed suit against her former in-laws seeking a declaratory judgment and an injunction, arguing that any obligation under the note had been satisfied in full when the Woodinville property sold, notwithstanding the language of the note encumbering the Hayden Lake property. Annie and Tony answered Jennifer's complaint by filing a counter-claim against her and a third-party complaint against Mark.

After a trial extending over eight days in April and May 2018, the district court granted Jennifer's request for a declaratory judgment. By this time, Annie and Tony had died and were substituted for as parties in the litigation by their respective estates. The district court also denied the estates' request for judicial foreclosure, and dismissed their third-party claims against Mark. The district court held that the Note and Deed of Trust were latently ambiguous because the amount of the Note was more than twice the amount Mark and Jennifer needed in order to purchase the Hayden Lake property. Because the district court concluded the note and deed of trust were ambiguous, it considered parol evidence to interpret them. Ultimately, the district court found the Note and Deed of Trust conveyed the Hayden Lake property to Jennifer and Mark "free and clear" upon the sale of the Woodinville property.

Annie's and Tony's estates timely appealed the district court's decisions. For the reasons set out below, we vacate the judgment of the district court and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background.

This case involves three generations of the Porcello family, multiple properties in three different states, and several real estate transactions between a married couple Ann Porcello (Annie) and Anthony Porcello (Tony), their son, Mark Porcello (Mark), and his now ex-wife Jennifer Porcello[2] (Jennifer). As noted, both Annie and Tony died during the pendency of this dispute. Their estates have since been substituted for each of them. The personal representative of both estates is Kalyn Porcello (Kalyn), who is Mark's daughter from a previous marriage. The estates of Annie and Tony will be collectively referred to as "the Estates" in this opinion. The first names of the parties are being used to refer to them to avoid confusion with other family members who share the common surname.

---

[2] Jennifer has since returned to using her maiden name, Maggard.

3

The various parties' finances, assets, and relationships are confusingly intertwined. Although the real property which is the subject of the Note and Deed of Trust in this case is the Hayden Lake property, several other properties are relevant to the underlying dispute. The first is a property located in Woodinville, Washington. Annie and Mark purchased this property jointly in 2012, with partial financing provided by Wells Fargo from a loan obtained by Annie and Tony.[3] This property will be referred to as the Woodinville property. The second is a home located in Indian Wells, California, which was originally owned by Annie as her separate property. This home is situated on Via Venito, a street in Indian Wells. This property has been and will continue to be referred to as the Via Venito property. The third property is a home in Bellevue, Washington. Mark leased this property with an option to purchase it. This property will be referred to as the Bellevue property.

This case also involves three loans undertaken by Annie and Tony. The first loan—the one most closely associated with the Note and Deed of Trust in this case—was a short-term "hard money" loan provided by Legacy Group Capital (the Legacy loan) in the amount of $648,500. The Legacy loan was secured by both the Woodinville property and the Via Venito property. The second and third loans were both conventional loans provided by Evergreen Mortgage Company (Evergreen) to Annie and Tony which in many respects replaced the Legacy loan. The first Evergreen loan was collateralized by the Woodinville property. The second Evergreen loan was collateralized by the Via Venito property.

Further complicating matters is the fact that multiple generations of the Porcello family have also been involved in two jewelry businesses that were owned and operated by various family members. While the two businesses evidently used to work closely together, several conflicts arose between them that left the parties "entrenched in their respective positions[,]" as the district court put it. Litigation relating to those entities has also ensued. This ongoing litigation and the parties' commingling of finances have also made it difficult to parse out contributions to the various real estate transactions conducted by Mark and his parents.

---

[3] Although Annie and Tony jointly took out several loans relevant to this case, Tony's testimony and the district court's findings reflect that Annie "was more involved in the dealings with Mark than [Tony] was, [and] that [Tony] signed documents when [Annie] told him to[.]" One of the reasons the loans were undertaken by Annie and Tony, without Mark's participation, was Mark's inability to obtain conventional financing. The explanation for this inability was Mark's divorces, bankruptcy, poor credit rating, and struggle with addiction.

Finally, Mark and Jennifer themselves have been married twice and have had a turbulent relationship. Mark and Jennifer were first married from 2003 to 2007. Following their reconciliation and second marriage, which began in 2013 and ended in 2015, the Woodinville property was purchased.[4] The transaction that is the subject of this case—purchase of the Hayden Lake property—was entered into during Mark and Jennifer's second marriage. Mark and Jennifer divorced for the second time in 2017, and Jennifer was awarded ownership of the Hayden Lake home in the divorce proceedings. Jennifer continues to live there with her daughters. Notably, the district court found that, despite their "long, often acrimonious relationship[,]" Mark and Jennifer's testimony was consistent with each other's and made logical sense.

With this background, the specific facts of the case are as follows.

1. <u>2012 purchase of the Woodinville property.</u>

Mark and Annie decided to purchase a home together in Woodinville, Washington, in 2011. The purchase price was $401,000. Annie paid $93,000 as a down payment.[5] Annie and Tony took out a loan from Wells Fargo for the balance and titled the Woodinville property in their names only. The district court found that "[t]he agreement between Mark and Annie was that Annie would pay the down payment [of $93,000] on the Woodinville home, and Mark and Jennifer would live in the home. Mark would then make the monthly payments to Wells Fargo." Renovations were needed on the Woodinville home, to which Mark, Annie, and Jennifer each contributed, although the amounts contributed by each continue to be disputed. The district court found that Jennifer contributed sweat equity and that Mark had been reimbursed by Annie for some of the renovation costs.

In 2013, Mark and Jennifer's relationship again deteriorated; Mark moved out of the Woodinville home briefly, during which time he stopped making monthly payments on the Wells Fargo mortgage. During this period of time, Mark and Jennifer were involved in several family law issues in Washington state courts, and Annie sought to evict Jennifer from the Woodinville home. Jennifer asserted she had an equitable interest in the home; however, this interest was not recognized in an arbitration proceeding in August 2013. Jennifer was required to vacate the

---

[4] The parties have heavily disputed their respective contributions to the purchase and renovations of the Woodinville property.

[5] The district court found there was no evidence supporting Mark's contention that he repaid Annie about half of this down payment.

house as a result of the arbitration proceeding. However, Mark and Jennifer reconciled in November 2013, and Mark resumed making payments on the mortgage. Mark and Jennifer then remarried. It was at this point that Mark and Jennifer decided to move to Idaho.

2. <u>2014 purchase of the Hayden Lake property.</u>

Mark and Jennifer located a home in Hayden Lake, Idaho, they sought to purchase. The purchase price was $360,000; they put down $20,000 in earnest money and moved in before closing. However, they were unable to secure conventional financing to complete the purchase. Closing was extended from July 31, 2014, to September 4, 2014, and the two were required to pay an additional $20,000 in earnest money and $5,000 in rent, which was later credited against the purchase price. Mark and Jennifer still needed approximately $312,000 to close on the property by September 4, 2014. Proceeds from the Woodinville property would have assisted them in the purchase, but the renovations on that property were not yet complete and a sale could not be achieved without the house being renovated. Because Mark was unable to obtain a conventional loan, he asked Annie for help to complete the purchase of the Hayden Lake property.

On August 27, 2014, Annie and Tony took out the Legacy loan in the amount of $648,500. The Legacy loan had a term of ninety days and an interest rate of 12%. The Legacy loan was secured by the Woodinville property and the Via Venito property, but not the Hayden Lake home.[6] In addition, LGC would only lend money to Annie and Tony if it were in a first position, which meant the outstanding Wells Fargo mortgage had to be paid off; however, there was insufficient equity in the Woodinville property itself to both pay off Wells Fargo's first position in the property and fund the purchase of the Hayden Lake property. As a result, Annie had to put up her Via Venito property, in addition to the Woodinville property, as collateral. As found by the district court, the parties expected the Woodinville property to sell within the loan's term of ninety days, and that the proceeds from the sale of the Woodinville property would go toward paying off the balance of the Legacy loan.

---

[6] LGC did not conduct business in Idaho. LGC required that the property used as collateral for any loan issued by it needed to be in a state in which LGC conducted business. LGC was licensed in both California and Washington. Hence, the loan was collateralized by the Via Venito and Woodinville properties.

The Legacy loan funds were disbursed to Annie and Tony on September 2, 2014, and were distributed as follows:

- $17,315.50 in settlement charges on the loan;
- $270,462.00 to pay off the Wells Fargo mortgage on the Woodinville home;
- $312,044.32 toward the purchase of the Hayden Lake property[7];
- $48,677.62 as cash.[8]

Joe Mijich (Mijich) was Annie and Tony's attorney. Mijich drafted the Note and Deed of Trust for the closing of the Hayden Lake property. According to Mijich, this Note and Deed of Trust were drafted to mirror the Legacy loan terms, including the total loan amount of $648,500. Mijich testified that the Note and Deed of Trust were in the same amount as the Legacy loan because Annie and Tony "wanted to make sure . . . they had some security back, so they wanted a note, a similar note to be signed by – by Mark and Jennifer . . . – under the same conditions of the note that they were borrowing on." Mijich also stated that he expected the obligations of the Note to be adjusted after the Legacy loan was paid off.

On September 3, 2014, Mark and Jennifer went to Pioneer Title Company to sign the closing paperwork for the Hayden Lake property. When they were presented with the Note and Deed of Trust, Jennifer became upset when she noticed that the principal amount of the Note was $648,500, despite the HUD-1 settlement statement for closing on the Hayden Lake property showing that the purchase price was only $360,000. Even with this disparity, Mark signed the Note and Deed of Trust. Jennifer, however, refused to sign. Mark and Jennifer left Pioneer Title Company between 5:00 and 5:15 p.m. Shortly thereafter, Mark and Jennifer pulled over to the side of the road to make a series of phone calls. Mark initially called Tony to ask about the Note and Deed of Trust. According to both Mark and Jennifer, Tony told Mark to call Mijich.

Although Mijich denied speaking with Mark and Jennifer on the day in question, in part because he had no billing record corroborating the conversation, phone records admitted at trial show that Mark placed a call to Mijich's cell phone at 5:24 p.m., which lasted for approximately

---

[7] This amount was disbursed directly to Pioneer Title Company, which handled the escrow for the purchase of the Hayden Lake property.

[8] The district court concluded that the cash was paid to Annie and Tony. However, the Estates argue that this money was actually paid to Mark. The evidence from trial suggests the Estates' attribution of the payments is correct. At trial, Mark was asked if the $48,677.62 had been paid to him. His response was that he assumed that was correct. Kayln also testified that the money was paid to Mark. It does not appear that the district court's conclusion that this cash was paid to Annie and Tony is ultimately supported by the evidence at trial.

ten minutes. According to Mark and Jennifer, Mijich told them that the Note and Deed of Trust needed to match the amount of the Legacy loan because a portion of the Legacy loan was being used to purchase the Hayden Lake property and both the Woodinville and Via Venito properties were being used as collateral. Mijich purportedly told them that once the Woodinville property sold and the Legacy loan was paid in full, the Hayden Lake home would belong to Mark and Jennifer "free and clear."

The next day, Jennifer returned to Pioneer Title Company and signed the Note and Deed of Trust. Pioneer Title Company received the $312,044.32 on behalf of Mark and Jennifer, and the purchase of the Hayden Lake property closed.

3. Renovation and sale of the Woodinville property.

Between the summers of 2014 and 2015, several projects were planned for the Woodinville property, including replacing the driveway, repainting certain rooms, repairing the swimming pool, installing new cabinets and counters in the kitchen, and landscaping the yard. The amounts contributed by the parties to this remodel were hotly disputed by the parties, but the district court found that the amounts Mark and Annie invested in the property were roughly equal, and that Jennifer's contribution was in sweat equity.

At some point during this renovation in the summer of 2014, Annie drafted a note. This note read:

> To Whom It May Concern:
> I, Ann Porcello agree to the following: When the house in Woodinville sells . . . . I will have $150,000.00 transferred for the purchase of the home at 1663 Northwest Dr., Hayden, [sic] Idaho 83835. Please advise me if there is any specific way that this needs to be handled.

The note is dated July 1, 2014. The note was later signed by Tony, but he testified he did not know why Annie asked him to sign it. Tony contended that the note was not meant to be a gift or repayment for renovations on the Woodinville property.

According to Jennifer, this note was her "security" so that her contribution to the Woodinville renovations would be recognized. (Her contribution to the earlier work on the Woodinville property had not been recognized during the 2013 arbitration proceedings.) According to Mark, Annie intended the note to recognize Mark's investment in the Woodinville property. Regarding the note, the district court found "that Annie wrote the note intending to repay Mark and Jennifer for their equity in the Woodinville home and designating that the $150,000 go toward payment of the Hayden [Lake] home."

8

4. The Evergreen loans.

The Woodinville property was not ready to sell as quickly as anticipated. While the Woodinville property was being renovated, the Legacy loan came due. The Legacy loan term was extended, but Mark, who had the obligation to make monthly interest payments on the Legacy loan, was experiencing financial strain. To reduce the amount of the monthly payments, and to avoid extreme penalties for nonpayment, Annie and Tony took out two conventional loans from Evergreen. Evergreen disbursed the proceeds from the first loan on May 14, 2015. This loan was secured by the Woodinville property and was in the amount of $480,000. Annie and Tony used the proceeds to pay down the Legacy loan by about $470,000. This left an outstanding obligation on the Legacy loan of roughly $193,400.

Evergreen disbursed the proceeds from the second loan on July 21, 2015; this loan was secured by the Via Venito property and was in the amount of $417,000. According to Mark, this loan was originally obtained so that he could exercise his option to purchase the Bellevue property. Mark stated that he and Annie had planned for the Woodinville property to sell two or three days before the second Evergreen loan paid out, so that the Woodinville property proceeds would be used to pay the balance of the outstanding Legacy loan. However, the second Evergreen loan was disbursed before the Woodinville property sold. As a result, the second Evergreen loan was used to pay the balance of the Legacy loan, in addition to several unrelated expenses.

The Woodinville property finally sold in July 2015. The proceeds from the sale of the property were paid out on July 30, 2015, and were used to pay off the first Evergreen loan. Of the Woodinville proceeds, Mark received a check from Tony for $157,157.40, which he put toward the purchase of the Bellevue property. At that time, the Legacy loan and the first Evergreen loan had been paid in full.

5. Events leading to non-judicial foreclosure proceedings on the Hayden Lake property.

Mark and Jennifer's relationship deteriorated yet again. The two separated in 2015. Jennifer filed for divorce a second time in April 2015, although the divorce was not finalized until 2017. Jennifer contends that she was not privy to Mark and Annie's actions regarding the Evergreen loans, and did not learn about the various refinancings until much later. However, Jennifer continued to live in the Hayden Lake home with her five daughters.

In June 2016, Annie and Tony commenced a non-judicial foreclosure proceeding against the Hayden Lake property.

## B. Procedural Background.

Jennifer filed this action on October 5, 2016, against Annie and Tony, seeking a preliminary injunction to stop the trustee's sale, and to obtain a declaratory judgment resolving her ownership of the property. On February 13, 2017, Annie and Tony counterclaimed against Jennifer and brought a third-party complaint against Mark.[9] Annie and Tony claimed that Mark and Jennifer had not paid interest as required on the Note, and that the total amount of the Note was due and owing.

Annie and Tony moved for summary judgment against Jennifer in December 2017. After briefing and argument, the district court denied their motion. The district court denied summary judgment on the basis that genuine issues of material fact remained as to whether Jennifer had some equitable interest in the Woodinville house and whether some amount was owed Jennifer toward the purchase cost of the Hayden Lake home. However, in denying summary judgment, the district court addressed specific arguments made by Annie and Tony "[b]ecause it may aid the parties in resolving this declaratory judgment action[.]" First, the district court addressed the applicability of the parol evidence rule, observing that there was no merger clause in the Note and Deed of Trust. The district court also pointed out that parol evidence would always be admissible to show fraud in the inducement, which, according to the district court, Jennifer had alleged.[10] Second, the district court observed that there "may also be latent ambiguities in the contract, to the extent there is a contract, which would allow the use of parol evidence in interpreting the contract." The case went to trial before the district court, and was conducted over a period of eight days in April and May 2018.

Following the submission of written closing arguments by the parties, the district court entered its memorandum decision and order. The district court first evaluated the testimony presented by the parties, finding that Annie's and Tony's witnesses were on the whole less credible than the witnesses provided by Mark and Jennifer. The district court made findings of

---

[9] Annie died in February 2017. Her granddaughter, Kalyn, was appointed as personal representative of her estate. Tony died after the trial. Kalyn was also appointed personal representative of his estate.

[10] The law in Idaho is well-settled with regard to the pleading specificity required to assert a claim for fraud. A claim of fraud must be set out with particularity. *See* I.R.C.P. 9(b). Jennifer's complaint did not assert a claim of fraud with the requisite particularity. To the extent the district court allowed parol evidence to be admitted on the basis Jennifer claimed she was the victim of fraud, the district court erred.

fact as to the parties' relative contributions to the Woodinville renovations, the intent behind the handwritten note signed by Annie and Tony, and two checks issued by Annie to Mark in September 2014. Further, the district court concluded that the evidence established that a phone conversation had occurred between Mijich, Mark, and Jennifer, on September 3, 2014, and that Mark and Jennifer's account of this conversation was internally consistent and made the most sense to the district judge.

The district court concluded that the Note and Deed of Trust were latently ambiguous "because the principal amount due under the Note is more than double the amount Mark and Jennifer needed to purchase the subject property." The district court stated that "the Note and Deed of Trust do not reflect the entire agreement of the parties because the Note and Deed of Trust, on their face, do not make sense." The district court also observed that the Note was a negotiable instrument, and applied Idaho Code section 28-3-117 and its official comment. Accordingly, the district court relied on this statute to allow the introduction of extrinsic evidence to determine the intent of the parties at the time the Note and Deed of Trust were signed.[11]

The district court concluded that the extrinsic evidence presented at trial established that the parties' intent was for Mark and Jennifer's obligation under the Note and Deed of Trust to terminate once the Woodinville home sold and the Legacy loan was paid off in full. Noting that Mijich was speaking on behalf of Annie and Tony during the cell phone conversation, the district court concluded it was reasonable for Mark and Jennifer to rely on Mijich's representations. The district court also concluded that the purported future advances—the two Evergreen loans—were not intended to be covered by the Note. The district court determined that it was "unnecessary . . . to determine a precise amount" that the parties owed each other "based on investments,

---

[11] Idaho Code section 28-3-117 is entitled "Other Agreements Affecting Instrument," and states:

> Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, *the obligation of a party to an instrument to pay the instrument may be modified, supplemented or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement.* To the extent an obligation is modified, supplemented or nullified by an agreement under this section, the agreement is a defense to the obligation.

I.C. § 28-3-117 (italics added). Because we find that the "applicable law regarding exclusion of proof of contemporaneous or previous agreements . . ." supersedes this provision, we find reliance on Idaho Code section 28-3-117 in this particular case to be error.

amounts borrowed, closing expenses, renovation expenses, sweat equity, and other considerations." "Based on the [c]ourt's finding of the parties' intent, the Legacy [l]oan was repaid in full, which in turn satisfied the Note on the Hayden [Lake] home." The district court granted Jennifer's request for a declaratory judgment, denied Annie and Tony's request for judicial foreclosure, and granted Mark's request for dismissal of the claims against him.

The Estates of Annie and Tony timely appealed.

## II.    STANDARD OF REVIEW

Review of a trial court's conclusions following a bench trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. Since it is the province of the trial court to weigh conflicting evidence and testimony and to judge the credibility of witnesses, this Court will liberally construe the trial court's findings of fact in favor of the judgment entered. This Court will not set aside a trial court's findings of fact unless the findings are clearly erroneous. If the trial court based its findings on substantial evidence, even if the evidence is conflicting, this Court will not overturn those findings on appeal. Additionally, this Court will not substitute its view of the facts for that of the trial court. This Court exercises free review over matters of law.

*Liberty Bankers Life Ins. Co. v. Witherspoon, Kelley, Davenport & Toole, P.S.*, 159 Idaho 679, 686, 365 P.3d 1033, 1040 (2016) (quoting *Big Wood Ranch, LLC v. Water Users' Ass'n of Broadford Slough & Rockwell Bypass Lateral Ditches, Inc.*, 158 Idaho 225, 230, 345 P.3d 1015, 1020 (2015)). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Nw. Farm Credit Servs., FLCA v. Lake Cascade Airpark, LLC*, 156 Idaho 758, 763, 331 P.3d 500, 505 (2014) (quoting *Jarvis v. Rexburg Nursing Ctr.*, 136 Idaho 579, 583, 38 P.3d 617, 621 (2001)).

"Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact." *Thurston Enters., Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 709, 717, 435 P.3d 489, 497 (2019) (quoting *Phillips v. Gomez*, 162 Idaho 803, 807, 405 P.3d 588, 592 (2017)).

## III.    ANALYSIS

### A. The Estates have not waived their objection to the admission of parol evidence. The issue was argued below and has been preserved.

The Estates moved for summary judgment below arguing that the Note and Deed of Trust were unambiguous and therefore parol evidence would be inadmissible to interpret them. The district court denied summary judgment on the basis that genuine issues of material fact

remained as to whether Jennifer had some equitable interest in the Woodinville house and, if so, what amount was owed Jennifer toward the purchase of the Hayden Lake property. After providing its analysis, the district court went on to address several arguments that the Estates had made, cautioning the parties that they "should recognize that the following does not constitute the [c]ourt's analysis in denying summary judgment." In particular, the district court addressed the Estates' argument that the parol evidence rule applied to bar extrinsic evidence regarding the parties' intent. The district court also analyzed the Estates' argument that the statute of frauds applied. At trial, each of the parties offered extrinsic evidence of the parties' agreement leading up to the signing of the Note and Deed of Trust. Throughout the trial, the Estates never objected to this evidence on the basis it was barred by the parol evidence rule. Nevertheless, Jennifer's counsel argued in written closing that the district court should again reject the Estates' argument seeking to preclude parol evidence.

On appeal, Jennifer argues that this issue has been waived by the Estates. Jennifer points out that after summary judgment, the Estates "made no mention of the parol evidence rule as a bar to any of the evidence[,]" and also presented extrinsic evidence of their own. This was a "tactical decision" by the Estates, Jennifer contends, which resulted in a "waiver of their objection based on the parol evidence rule."

The Estates cite *Reynolds Irrigation District v. Sprout*, 69 Idaho 315, 327, 206 P.2d 774, 781 (1948), for the proposition that the parol evidence rule is a rule of substantive law, not a rule of evidence. Based on this authority, the Estates contend that "failure to object to the admission of parol evidence [at trial] is not a waiver." Further, the Estates argue that they framed and raised the issue properly before the district court, and that Jennifer renewed her argument on this issue in her closing reply argument.

There can be little doubt the Estates argued at summary judgment that the rule against parol evidence applied to bar extrinsic evidence to interpret the Note and Deed of Trust.[12] Accordingly, the question is whether the Estates' failure to object to admission of the parol evidence *at trial* constitutes a waiver of this issue on appeal.

---

[12] Although the Estates' briefing on summary judgment has not been included in the record on appeal, it is clear from the district court's decision denying summary judgment that the argument was made.

"[A]n issue presented on appeal must have been properly framed and preserved in the court below." *Fed. Home Loan Mortg. Corp. v. Butcher*, 157 Idaho 577, 581, 338 P.3d 556, 560 (2014) (quotation omitted). In *Reynolds Irrigation District*, this Court noted that

> the parol evidence rule, as applied to contracts, is a rule, not of evidence or of evidence merely, but of substantive law, it being considered that parol evidence is excluded because the law requires the terms of the agreement to be found in the writing itself and not because of any reasons which ordinarily require the exclusion of evidence, such as some policy against its admission, or its untrustworthiness or lack of probative value.

*Reynolds Irrigation Dist.*, 69 Idaho at 327, 206 P.2d at 781 (quotation omitted).

The Estates' lack of objection to the admission of parol evidence at trial does not constitute a waiver of their ability to argue this matter on appeal. The district court was clearly aware of the issue at summary judgment. The Estates argued that the rule against parol evidence barred the district court's consideration of extrinsic evidence. It is obvious from this record that the district court specifically considered whether extrinsic evidence would be barred by the parol evidence rule when it denied summary judgment to the Estates. In rejecting the Estates' motion for summary judgement, the district court was rejecting the Estates' argument that parol evidence should be excluded. Otherwise, the district court would have granted summary judgment to the Estates. Jennifer's counsel also argued in written closing, after the conclusion of the trial, that the district court should reject the Estates' effort to preclude parol evidence. And the district court addressed the applicability of the parol evidence rule in its final memorandum decision. Accordingly, the Estates' failure to object to the admission of extrinsic evidence at trial does not constitute a waiver of their right to question the legal sufficiency of that evidence to vary or alter the terms of the Note and Deed of Trust. *See Evans v. Cavanagh*, 58 Idaho 324, 73 P.2d 83, 86 (1937).

**B. The district court erred in finding a latent ambiguity in the Note and Deed of Trust.**

The district court concluded that the Note and Deed of Trust contained a latent ambiguity and that it was, therefore, appropriate to consider parol evidence to interpret them. The district court's reasoning consisted of the following:

> The [c]ourt determines the Note and Deed of Trust on the Hayden [Lake] home contain a latent ambiguity because the principal amount due under the Note is more than double the amount Mark and Jennifer needed to purchase the subject property. The purchase price for the Hayden [Lake] home was $360,000, and $312,044 was needed to close on the home. The principal amount on the Note is $648,500. It is clear that the Note and Deed of Trust do not reflect the entire

14

agreement of the parties because the Note and Deed of Trust, on their face, do not make sense. Thus, it is appropriate for the [c]ourt to consider the extrinsic evidence to determine the parties' intent at the time the Note and Deed of Trust were signed. All of the parties in this litigation presented extrinsic evidence of the parties' intent.

On appeal, the Estates contend that the district court erred because a latent ambiguity must be tied to a specific term in the agreement that objectively holds more than one meaning. The Estates argue that there is no case law allowing a court "to find a latent ambiguity untethered to the contract's actual language and its application to the existing facts." The Estates argue that the district court erred in finding a latent ambiguity because "[t]here is nothing uncertain about Mark and Jennifer's promise to pay $648,500."

Jennifer and Mark argue that the Estates' argument would limit latent ambiguities to those situations where a term is susceptible of more than one reasonable meaning. Jennifer contends that a latent ambiguity can also be found where the language of the contract, as applied to the known facts, is nonsensical. (Citing *Canyon Highway Dist. No. 4 v. Canyon Cty.*, 107 Idaho 995, 997, 695 P.2d 380, 383 (1985).)

"If [an instrument's] terms are clear and unambiguous, [its] meaning and legal effect[s] are questions of law to be determined from the plain meaning of its own words." *Sky Canyon Props., LLC v. Golf Club at Black Rock, LLC*, 155 Idaho 604, 606, 315 P.3d 792, 794 (2013) (quotation omitted). "There are two types of ambiguity, patent and latent." *E. Side Highway Dist. v. Delavan*, No. 45553, 2019 WL 6724484, at *15 (Idaho Dec. 11, 2019) (quoting *Knipe Land Co.*, 151 Idaho at 455, 259 P.3d at 601). "A patent ambiguity exists when the document is ambiguous on its face." *Id.* (quotation omitted). "A latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist." *Id.* (citation omitted). This includes an ambiguity that does not "appear upon the face of the [agreement], but lies hidden in the subject to which it has reference[.]" *Williams v. Idaho Potato Starch Co.*, 73 Idaho 13, 20, 245 P.2d 1045, 1049 (1952). This Court has described "the process in explaining latent ambiguity" as being "divided into two parts: First, the introduction of extrinsic evidence to show that the latent ambiguity actually existed; and, second, the introduction of extrinsic evidence to explain what was intended by the ambiguous statement." *Snoderly*, 30 Idaho at 487, 166 P. at 265.

There are two issues for this Court to determine. First, we must decide whether an ambiguity must be tethered to a specific provision in an instrument. Second, we must determine whether the district court erred in finding a latent ambiguity.

    1.   <u>Analysis of ambiguity in a contract must be tied to the language of the contract itself.</u>

While a discussion of the parol evidence rule begins with a *document*, this Court has never clearly held that a latent ambiguity must be "tethered" to a *specific provision* in that document. Most cases regarding a latent ambiguity involve interpretation of a particular provision in a document. *See, e.g.*, *Rangen, Inc. v. Idaho Dep't of Water Res.*, 159 Idaho 798, 808, 367 P.3d 193, 203 (2016) (language in water law decree referring to specific tunnel); *Mountainview Landowners Co-op. Ass'n, Inc. v. Cool*, 139 Idaho 770, 771, 86 P.3d 484, 485 (2004) (language in easement referring to "swimming"); *Carl H. Christensen Family Tr. v. Christensen*, 133 Idaho 866, 873, 993 P.2d 1197, 1204 (1999) (language in trust instrument regarding trustees' capacity); *Williams*, 73 Idaho at 20, 245 P.2d at 1049 (language in contract referring to "pump").

This Court has also found latent ambiguities with respect to the legal effect of an instrument where certain terms were not actually contained in the instrument being interpreted. *See Kessler v. Tortoise Dev., Inc. (Kessler I)*, 130 Idaho 105, 108, 937 P.2d 417, 420 (1997); and *In re Estate of Kirk*, 127 Idaho 817, 824, 907 P.2d 794, 801 (1995). In *Kessler I*, for example, this Court found that an ambiguity existed where three provisions in a purchase and sale agreement were potentially controlling on the issue of whether specific performance was available to the purchaser. *Kessler I*, 130 Idaho at 108, 937 P.2d at 420. Although this Court did not clearly specify whether this was a patent or latent ambiguity, after remand and a second appeal, this Court affirmed the district court's determination that a latent ambiguity existed under these circumstances. *See Kessler v. Tortoise Dev., Inc. (Kessler II)*, 134 Idaho 264, 269, 1 P.3d 292, 297 (2000). Similarly, in *Estate of Kirk*, a testator stapled a handwritten document containing language of a conditional gift to an amendment to a trust. *See Estate of Kirk*, 127 Idaho at 820, 907 P.2d at 797. This Court affirmed the district court's finding that there was a latent ambiguity as to the conditional or permanent nature of the handwritten document, notwithstanding the conditional language that had been used. *Id.* at 824, 907 P.2d at 801.

However, in these cases, the heart of the ambiguity was rooted in provisions of the instruments. In *Kessler II*, the ambiguity was tethered to whether the purchaser's remedy was

16

controlled by one (or none) of three provisions. 134 Idaho at 269, 1 P.3d at 297. Likewise, in *Estate of Kirk*, the latent ambiguity was ultimately tethered to the conditional language in the handwritten document, created by its physical attachment to the permanent trust amendment. *Estate of Kirk*, 127 Idaho at 820, 907 P.2d at 797.

Accordingly, it is clear that a latent ambiguity in a contract must ultimately be tied to the language of the instrument itself. Latent ambiguities by nature only emerge when the *instrument* is "applied to the facts as they exist." *Knipe Land Co.*, 151 Idaho at 455, 259 P.3d at 601. Interpretation of a contract requires an inquiry into its "legal meaning and effect[.]" *Taylor v. Browning*, 129 Idaho 483, 488, 927 P.2d 873, 878 (1996). In determining ambiguity, as articulated by Professor Williston, "the court hears the proffer of the parties and determines if there are objective indicia that, from the parties' linguistic reference point, *the contract's terms are susceptible of different meanings*." 11 Williston on Contracts § 30:5 (4th ed.) (italics added).

2. <u>The district court erred in determining that a latent ambiguity existed.</u>

Even acknowledging that the district court tied its finding of latent ambiguity to the instrument's price term by pointing to the difference in terms between the Note and Deed of Trust and the amount needed to close on the Hayden Lake property, we do not agree with the district court's conclusion that a latent ambiguity existed.

Professor Williston describes several factors to be taken into account in an analysis of ambiguity:

> The court must consider the words of the agreement, including writings made a part of the contract by annexation or incorporation by reference, the alternative meanings suggested by the parties, and any extrinsic evidence offered in support of those meanings. Extrinsic evidence properly considered in deciding whether the contract is ambiguous may include the structure of the contract; the parties' relative positions and bargaining power; the bargaining history; whether one of the parties prepared the instrument, so that the language should be construed most strongly against it; and any conduct of the parties which reflects their understanding of the contract's meaning.
>
> Only after a careful and painstaking search of all the factors shedding light on the intent of the parties will the court conclude that the language in any given case is clear and unambiguous.

11 Williston on Contracts § 30:5 (4th ed.) (footnotes omitted).

In reading the Note and Deed of Trust, we are unable to find a latent ambiguity. The evidence reveals that the Note's principal amount is not out of proportion with the total amount of indebtedness on the Woodinville and the Hayden Lake properties. (Or, as Jennifer has argued,

we do not find the agreement "nonsensical.") The Legacy loan was used in significant part to pay off the outstanding Wells Fargo mortgage on the Woodinville property. It is not clear who was ultimately obligated to pay the Wells Fargo mortgage, but it is clear that Mark was paying the monthly principal and interest on the mortgage when he and Jennifer lived on the property. It is also clear that Mark was obliged to make the payments on the Legacy loan once it supplanted the Wells Fargo mortgage. Adding the Wells Fargo mortgage payoff, $270,000, together with the amount required to purchase the Hayden Lake property, $312,044, yields $582,044. Comparing this figure, $582,044, with the total amount of the Note, $648,000, we are unpersuaded that a latent ambiguity is evident in the documents. Accordingly, the district court erred in finding that a latent ambiguity allowed it to use extrinsic evidence to interpret the Note and Deed of Trust.

### C. Parol evidence was admissible to interpret the Note and Deed of Trust because the agreement was not integrated.

In its memorandum decision, the district court concluded that it was proper to consider extrinsic evidence to interpret the Note and Deed of Trust, reasoning that a latent ambiguity existed stating: "It is clear that the Note and Deed of Trust do not reflect the entire agreement of the parties because the Note and Deed of Trust, on their face, do not make sense. Thus, it is appropriate for the [c]ourt to consider the extrinsic evidence to determine the parties' intent at the time the Note and Deed of Trust were signed."

On appeal, the Estates argue that the district court relied entirely on the latent ambiguity of the Note and Deed of Trust, rather than concluding it was incomplete. In order for an agreement to express the understanding of the parties it must be complete or integrated. Parol evidence may be elicited to expand or clarify an incomplete agreement. Jennifer argues that the district court correctly allowed parol evidence because the Note and Deed of Trust were incomplete and parol evidence was therefore necessary to explain the agreements. The Estates respond, contending that the district court did not make a finding that the agreement was incomplete. The Estates argue that, absent this finding by the district court below, the "right-result, wrong-theory" rule of appellate review does not allow this Court to address the completeness of the agreement because this Court would be "engaging in appellate fact-finding upon conflicting evidence."

Whether a contract is ambiguous is a question of law this Court reviews *de novo*. *Thurston Enters., Inc.*, 164 Idaho at 717, 435 P.3d at 497 (quotation omitted). "Whether a particular subject of negotiations is embodied in the writing depends on the intent of the parties,

18

revealed by their conduct and language, and by the surrounding circumstances." *Valley Bank v. Christensen*, 119 Idaho 496, 498, 808 P.2d 415, 417 (1991) (citing *Nysingh v. Warren*, 94 Idaho 384, 385, 488 P.2d 355, 356 (1971)). "A written contract that contains a merger clause is complete upon its face." *Howard v. Perry*, 141 Idaho 139, 142, 106 P.3d 465, 468 (2005) (quotation omitted).

Although this Court has not stated whether an agreement's completeness or integration is a finding of fact or a conclusion of law, this Court has historically reviewed this issue *de novo*. *See, e.g.*, *Howard*, 141 Idaho at 142, 106 P.3d at 468 (giving no deference to a trial court's determination that an agreement was not integrated). We are not alone in this approach; other courts view the broad question of whether the parol evidence rule applies (encompassing the issues of completeness and ambiguity) as a question of law subject to free review. *See, e.g.*, *Poeppel v. Lester*, 827 N.W.2d 580, 584 (S.D. 2013); *Alstom Power, Inc. v. Balcke-Durr, Inc.*, 849 A.2d 804, 811 (Conn. 2004).

We hold that the Note and Deed of Trust are incomplete with respect to the parties' intentions. We also conclude that whether an agreement is complete or integrated is a question of law over which we exercise *de novo* review. While we owe no deference to the district court on this question, the district court correctly concluded the agreement was incomplete. As noted by the district court: "It is clear that the Note and Deed of Trust *do not reflect a complete agreement of the parties* because the Note and Deed of Trust, on their face, do not make sense. Thus, it is appropriate for the [c]ourt to consider the extrinsic evidence to determine the parties' intent at the time the Note and Deed of Trust were signed." (Italics added.) We agree. The Note and Deed of Trust do not reflect a complete agreement of the parties. Reading the documents, it is not possible to divine the parties' intentions about the terms of the Note and Deed of Trust once the Woodinville property was sold and the Legacy loan was paid off. There are a number of facts that support this conclusion. First, although the Woodinville property and the Wells Fargo mortgage encumbering it were in Annie and Tony's name, Mark was the one who made mortgage payments directly to Wells Fargo while he and Jennifer lived in the Woodinville house. Second, Annie's handwritten note of July 2014, indicated that the proceeds from the sale of the Woodinville property would provide Mark and Jennifer a $150,000 credit toward the Hayden Lake purchase once the property was sold, even though this intention was nowhere spelled out in the Note and Deed of Trust. Third, during Mijich's deposition, he stated *he*

19

expected additional adjustments to be made to the Note once the Woodinville property sold. Mijich, it should be remembered, was the drafter of the documents. Finally, the evidence reveals that the terms of the Note and Deed of Trust were tied to another agreement, i.e., the Legacy loan. The record demonstrates that the principal and interest of the Legacy loan were mirrored in the Hayden Lake document apparently because Annie and Tony were concerned about Mark's ability to pay off that loan on its accelerated terms. Although it is clear that the Note and Deed of Trust were tied to the Legacy loan, the instruments themselves are silent about this connection, and are incomplete as to the intentions of the parties with regard to the various properties involved and what effect the payoff of the Legacy loan would have.

Ultimately, while the district court incorrectly determined the agreement contained a latent ambiguity, it correctly determined the agreement was not integrated and on this basis appropriately considered extrinsic evidence to interpret the Note and Deed of Trust. In sum, the district court came to the "right result." Whether it was under the "wrong theory" is immaterial. *See Idaho Sch. for Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 580, 850 P.2d 724, 731 (1993). The district courtconsidered parol evidence, not solely because of an incorrect finding of a latent ambiguity, but because it properly found that the agreement was incomplete. Thus, the district court ultimately did not err in its decision to consider parol evidence.

**D. The district court's interpretation of the Note and Deed of Trust is not supported by substantial and competent evidence.**

Having determined that it was proper to consider extrinsic evidence, the district court proceeded to interpret the Note and Deed of Trust to contain the condition that once the Woodinville property sold, Mark and Jennifer would own the Hayden Lake property "free and clear" and owe nothing on the Note. The district court relied on its finding of fact that the conversation between Mijich, Mark, and Jennifer had occurred. The district court reasoned that, given Mijich's role as Annie and Tony's attorney, it was reasonable for Mark and Jennifer to rely on his statement as part of the larger agreement regarding the ownership of the Hayden Lake property.

On appeal, the Estates argue that parol evidence can only be used to resolve the identified ambiguity, not to add new and material terms in the form of conditions. The Estates also contend that the district court's interpretation of the parties' intent is not supported by substantial and competent evidence because (1) the parties could not have intended for the Woodinville property to satisfy the debt owed on the LGC Loan; and (2) the district court did not understand Annie

20

and Tony's financial outlay. In particular, the Estates contend that the district court's findings cannot be reconciled with its other finding that Mark and Jennifer should receive $150,000 from the equity in the Woodinville property.

Substantial and competent evidence does not support the district court's interpretation of the Note and Deed of Trust with respect to ownership of the Hayden Lake property. The district court's findings of fact are at best internally inconsistent. As found by the district court, the handwritten note signed by Annie and Tony—dated July 1, 2014—was intended to recognize Mark and Jennifer's equity in the Woodinville house by crediting them with $150,000 toward purchase of the Hayden Lake home. Later in its opinion, the district court held that the intent of the parties regarding the Note and Deed of Trust was when the Woodinville property sold, Mark and Jennifer would own the Hayden Lake home "free and clear." These two factual findings are mutually contradictory. If Mark and Jennifer were to own the Hayden Lake home "free and clear" upon sale of the Woodinville property, there would be no need for a credit toward purchase of the Hayden Lake home. Conversely, if Mark and Jennifer were to receive a credit of $150,000 toward the purchase of the Hayden Lake home, it follows that there was a recognized debt against which the credit was to be applied. These internally inconsistent findings lead us to conclude that the district court clearly erred in interpreting the Note and Deed of Trust to contain a term that the entire obligation to pay would be satisfied once the Woodinville property sold. In addition, the district court concluded that Mark was entitled to rely on Mijich's statement even though there was no reliance on the statement by Mark. Prior to Jennifer balking at signing the agreement, Mark had already signed the agreement, yet the district court concluded both Jennifer and Mark could reasonably rely on Mijich's statement. It was error to also credit *Mark* with the benefit of Mijich's statement. For these reasons, we vacate the judgment of the district court and remand for further proceedings.

### E. The district court correctly determined that the Evergreen loans were not future advances on the Deed of Trust.

In its interpretation of the Note and Deed of Trust, the district court concluded that the advancement clause of the Deed did not include the two Evergreen loans, interest payments, and unrelated expenses. The district court concluded that it found "no credible evidence that the parties agreed that the Hayden [Lake] home would be used to secure subsequent refinanc[ing] of the Via Venito or Woodinville properties[,]" finding that there were no discussions of refinancing the Legacy loan until after the loan expired. The district court distinguished this case

21

from *Biersdorff v. Brumfield*, 93 Idaho 569, 468 P.2d 301 (1970), and rejected the Estates' reliance on *Countrywide Home Loans, Inc. v. Sheets*, 160 Idaho 268, 371 P.3d 322 (2016).

In analyzing future advances provisions in mortgages, appellate courts in Idaho have begun with the text of the security agreement at issue. *See, e.g.*, *Idaho Bank & Tr. Co. v. Cargill, Inc.*, 105 Idaho 83, 88, 665 P.2d 1093, 1098 (Ct. App. 1983) (discussing after-acquired collateral) ("[T]o protect the interests of debtors, creditors, purchasers and other interested persons, some definiteness and clarity must be imparted by the security agreement itself."); *Goss v. Iverson*, 72 Idaho 240, 244, 238 P.2d 1151, 1154 (1951) (examining lease and mortgage as to whether future advances were anticipated).

> Where it is plainly apparent from the terms of the mortgage that it was intended to secure future advances, the terms will control a contrary understanding of the mortgagor.
>
> Future advance clauses are enforceable according to their tenor. Where the intention of the parties is expressed in unambiguous terms, a court does not construe a future advances clause but enforces it as written.

59 C.J.S. *Mortgages* § 214 (footnote omitted).

The operative clause in the Deed of Trust requires that, for a future advance to be covered by the advancement clause, it must be "the express intention of the parties to this Deed of Trust that it shall stand as continuing security until paid for all such advances together with interest thereon." There is no evidence that the parties intended that the Deed of Trust would stand as continuing security for the Evergreen loans. Accordingly, the district court correctly determined that the Evergreen loans were not future advances on the Deed of Trust.

### F. Mark and Jennifer are entitled to a credit of $150,000 toward the purchase price of the Hayden Lake property.

The district court below made a factual finding that Annie's handwritten note was intended "to repay Mark and Jennifer for their equity in the Woodinville home and designating that the $150,000 go toward the payment of the Hayden [Lake] home." However, the district court later concluded that, given its interpretation of the Note and Deed of Trust, it was "unnecessary for the [c]ourt to determine a precise amount that Mark or Mark and Jennifer 'owe' Tony and Annie based on investments, amounts borrowed, closing expenses, renovation expenses, sweat equity, and other considerations."

Jennifer has asserted an additional issue on appeal, i.e., whether she is entitled to a credit against any sums determined by this Court to be owing on the Note and Deed of Trust in the

amount of $150,000. The Estates respond, pointing out that they have not appealed the district court's factual finding. The Estates further concede that there is substantial and competent evidence supporting the district court's findings that the parties' contributions to the Woodinville property were roughly equal, and reflect that $150,000 was Mark and Jennifer's equity in the Woodinville property. The district court's finding that Annie intended to recognize Mark and Jennifer's contribution to the Woodinville property is supported by substantial and competent evidence. Consequently, as to Jennifer's cross-appeal, the district court's decision will be affirmed and this credit should be reflected in any future judgment entered by the district court.

G. **None of the parties are entitled to attorney fees or costs on appeal as each of the parties has partially prevailed.**

The Estates seek attorney fees under the terms of the Note and Deed of Trust and costs under I.A.R. 40. They further seek attorney fees under Idaho Code section 12-120(3) as the prevailing party in a civil action to recover on a note or negotiable instrument. Both Jennifer and Mark also seek attorney fees under the same section.

Idaho Code section 12-120(3) allows for attorney fees to be awarded to the prevailing party in a civil action to recover on a note or negotiable instrument. I.C. § 12-120(3). This Court awards costs on appeal to the prevailing party. I.A.R. 40(a). However, this Court has declined to award attorney fees or costs when both parties have prevailed on appeal. *See Watkins Co., LLC v. Storms*, 152 Idaho 531, 540, 272 P.3d 503, 512 (2012); *Caldwell v. Cometto*, 151 Idaho 34, 41, 253 P.3d 708, 715 (2011). The Estates have partially prevailed because we are vacating the judgment of the district court because its interpretation of the Note and Deed of Trust was not supported by substantial and competent evidence. Jennifer and Mark have partially prevailed because we are affirming the district court's use of parol evidence to interpret the Note and Deed of Trust. Accordingly, under Idaho Code section 12-120(3), there is no prevailing party on appeal, and no party is entitled to attorney fees. For the same reason, no party is awarded costs on appeal.

Further, because we are vacating the district court's judgment and remanding the matter for further proceedings, there is not yet a prevailing party. *See Saint Alphonsus Diversified Care, Inc. v. MRI Assocs., LLP*, 148 Idaho 479, 501, 224 P.3d 1068, 1090 (2009). For this reason, we vacate the award of attorney fees below. On remand, once the district court enters a final judgment, it may again consider whether attorney fees are warranted. *See id.*

IV.     CONCLUSION

23

The district court's use of parol evidence to interpret the Note and Deed of Trust was proper because the agreement is incomplete. However, the district court's interpretation of the Note and Deed of Trust is not supported by substantial and competent evidence. The district court correctly determined that the Evergreen loans were not future advancements on the Deed of Trust. This Court vacates the judgment of the district court and remands the case for further proceedings as set out in this opinion.

Each of the parties has partially prevailed on appeal. Consequently, we decline to award costs or attorney fees in this appeal. Because we are vacating the district court's judgment, we also vacate the district court's award of attorney fees.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.